## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

SUSANNE PESTERFIELD,      )
                               )
      Plaintiff,         )
                               )     CIVIL ACTION FILE
v.                           )     NO._____
                               )
TRUIST INVESTMENT SERVICES,  )
INC. f/k/a SUNTRUST INVESTMENT )
SERVICES, INC.            )
                               )     **JURY TRIAL DEMANDED**
                               )
      Defendant.        )

## COMPLAINT

Plaintiff Susanne Pesterfield ("Plaintiff" or "Ms. Pesterfield") submits the following Complaint against Defendant Truist Investment Services, Inc. formerly known as SunTrust Investment Services, Inc. ("Defendant").

## INTRODUCTION

1.    Ms. Pesterfield brings this action against Defendant for sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") and for age discrimination and retaliation in violation of the Age Discrimination in Employment Act, ("ADEA"), 29 U.S.C. § 621 *et seq.*

2.    Ms. Pesterfield seeks back pay and lost economic benefits of her employment, liquidated damages, front pay in lieu of reinstatement, compensatory

damages, punitive damages, and her reasonable attorneys' fees and costs of litigation in an amount to be determined at trial.

## JURISDICTION AND VENUE

3.      Plaintiff's claims under Title VII and the ADEA present federal questions over which this Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

4.      This Court is an appropriate venue for all of Plaintiff's claims under 28 U.S.C. § 1391(b) and 42 U.S.C. §2000e-5(f)(3), because a substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district.

## ADMINISTRATIVE PROCEEDINGS

5.      Plaintiff filed a timely charge of discrimination and retaliation based on her sex and age with the Equal Employment Opportunity Commission ("EEOC").

6.      The EEOC found that there was reasonable cause to believe that Defendant denied Plaintiff accounts which impacted her commissions because of Plaintiff's sex and age in violation of Title VII and the ADEA.

7.      Plaintiff received a notice of right to sue from the EEOC within the last ninety (90) days and has complied with all other conditions precedent to the institution of this lawsuit.

## PARTIES

8.      Plaintiff is a 56 year old female and resides in the Northern District of Georgia.

9.      Plaintiff was employed by Defendant at all times material to this Complaint.

10.     Defendant is a domestic corporation with its principal office located at 3333 Peachtree Road, 3716 Floor, Atlanta, GA 30326 and is subject to the jurisdiction of this Court.

11.     Defendant may be served with process upon its registered agent, Corporation Service Company, 2 Sun Court, Suite 400, Peachtree Corners, GA, 30092, USA.

## FACTUAL ALLEGATIONS

**Plaintiff Begins Her Employment With Defendant and is Subjected to Discrimination**

12.     Before she was employed by Defendant, Ms. Pesterfield had a distinguished career as a stockbroker, with a 28 year history of successfully managing high-level accounts for various entertainment executives and performers, NFL players, CFOs, corporations, and high net-worth individuals.

13.     In early 2017, Ms. Pesterfield replaced Inga Ashley Larsson as a broker at Defendant's Colony Square branch.

14.    As Larsson's replacement, Ms. Pesterfield should have received the accounts previously assigned to Larsson.

15.    Instead, manager Tom Fluent gave the accounts to a male broker who worked in a different market in Atlanta.

16.    One of the most important factors in the re-assignment is the broker's business location in relation to that of the terminated registered and/or licensed individual.   In this case, the majority of Ms. Larsson's accounts were with two branches – Pershing and Colony – where Ms. Pesterfield was working.

17.    Fluent deviated from this practice and re-assigned the accounts to a male broker who worked more than 10 miles away in a different market.

18.    After she raised this issue and pointed out the inequity of the re-assignment, Ms. Pesterfield asked for identification of the re-assigned accounts. Defendant's account distribution methods at that time included producing a spreadsheet with all client account information for the IT department to recode accounts to the new broker.

19.    Instead of simply providing this readily available information to Ms. Pesterfield, Mr. Fluent claimed there was no record of what accounts were transferred. If true, this would be a violation of Defendant's rules and practices.

20.     After Ms. Pesterfield repeatedly raised the issue over several weeks, Fluent's response was to require Ms. Pesterfield to identify the accounts, even though he should already have had the information readily available.

21.     Ms. Pesterfield was forced to create a list of the accounts from the memory of the banking partners. She ultimately received only the accounts the banking partners could remember.

22.     Although Ms. Pesterfield was best situated to receive the accounts, which held several million dollars in assets, she was assigned only about $255,000 in account assets from the limited number of accounts ultimately reassigned to her.

23.     In early 2017, Ms. Pesterfield was set to have an appointment with a multi-million dollar client to discuss options for an approximately $1.4 million account.

24.     This came about because Ms. Pesterfield's Premier Banking partner, Michael Gonsalves, had asked her for advice on a certain investment issue for this client and Ms. Pesterfield had offered an attractive option.

25.     Defendant replaced her at the last minute with a new and substantially younger male hire named Todd Ryman.

26.     Ms. Pesterfield had more years of experience and had managed more lucrative accounts than Ryman. Yet Ms. Pesterfield's manager, Tom Fluent informed her that she had no right to this account.

27.     Ryman ultimately failed to close the deal.

28.     At the time Mr. Fluent denied Ms. Pesterfield the opportunity in favor of Mr. Ryman, Defendant's policy permitted Branch PFAs (like Ms. Pesterfield) to receive accounts up to $2 million.

29.     Mr. Fluent told Ms. Pesterfield, however, that she would receive only referral accounts up to only $1 million, rather than $2 million as allowed by Defendant's policy and as previously represented to her by Mr. Fluent.

30.     There was no legitimate basis for this limitation.

31.     In June 2017, Ms. Pesterfield sought to bring in a lucrative new client for Defendant, a Grammy-winning performing artist.  She had previously managed money for this artist, who was delighted with her work, from 2004-2006.

32.      Ms. Pesterfield told Mr. Fluent that she believed she could bring this artist in as a client.  In response, Fluent told her to refer the artist to the male-run Sports and Entertainment Group and that they would handle the business.

33.     Ms. Pesterfield had no objection to involving the Sports and Entertainment Group but quite reasonably wanted to be fairly compensated.

34.     During recruiting, Defendant represented to Ms. Pesterfield that she could partner with the Sports and Entertainment Group on any business she brought in. It was quite possible for her to involve the Sports and Entertainment

Group as the financial managers while she was retained as the portfolio manager if management directed.

35.     When Ms. Pesterfield asked Fluent about her share of commissions, Fluent told her she would not receive any and at best she might get a small referral fee. In so doing, Fluent cut Ms. Pesterfield off from an account opportunity she had sourced.

36.     Defendant, on multiple occasions, deprived Ms. Pesterfield of adequate, or any, working space while providing it to similarly situated men.

37.     In April 2017, Defendant told Ms. Pesterfield she would no longer have an office at the Colony Square branch due to "construction reasons." However, her male banking partner, Michael Gonsalves, was able to keep his office at the Colony Square location.

38.     In May 2017, Defendant again told Ms. Pesterfield that she would no longer have her office, this time at the Pershing Point branch. Again, her male banking partner, Gonsalves, was able to keep his office at the Pershing Point location.

39.     The loss of a workspace was more than an inconvenience; it adversely impacted Ms. Pesterfield's earnings.

40.     Ms. Pesterfield's primary source of business for both the Colony Square and the Pershing Point locations was a result of her physical presence at the branches.  In being present, she could speak to customers as they came in.

41.     Defendant's act of depriving Ms. Pesterfield of a physical office and workspace meant a loss of potential opportunity and revenue for her.

42.     Ms. Pesterfield had also been covering the Morningside Heights branch since she was hired. In October 2017, after losing her desks at the Colony Square and Pershing Point locations, she moved herself there full time under branch manager Frank Silvario.

43.     Once she had a workspace again, Ms. Pesterfield enjoyed renewed success. Her production contributed a significant share of the branch's success.

44.     Rich Johnson then took over as Bank Area Manager and Silvario was reassigned.

45.     On his first visit to the Morningside Heights branch, Mr. Johnson took Ms. Pesterfield's office away from her and ordered her not to go to the branch, even on Saturday, unless an appointment was made for her.

46.     Johnson's discriminatory action denied Ms. Pesterfield an office even though there was open office space at this branch which remained unoccupied after she was removed.

47.    Although Mr. Johnson did not have legitimate authority or oversight responsibility over Ms. Pesterfield, he nevertheless took this action against her.

48.    Johnson frequently took it upon himself to give Ms. Pesterfield unsolicited and unwarranted direction and criticism despite the required separation between the investment and banking sides.

49.    Around January 2018 Johnson and bank manager Scott Stearsman sat in on Ms. Pesterfield's Pershing Point "OneTeam" meeting with banking partners Washington and Gonsalves.

50.    At this point of less than one month into 2018 Ms. Pesterfield had already exceeded her annual goals for both Pershing Point and Morningside Heights. But instead of acknowledging Ms. Pesterfield's substantial achievement, Johnson accused her of being willing to "sit back on your laurels" and not work for the remainder of the year.

51.    Both Johnson and Stearsman berated Ms. Pesterfield during this meeting.

52.    Ms. Pesterfield complained to her manager, Cynthia Scott, about Mr. Johnson's and Mr. Stearsman's abusive behaviors.

53.    Ms. Scott's response was that Ms. Pesterfield should "smile and say thanks."

54.     From November 2017 until January 2018, Defendant provided Ms. Pesterfield with no workspace.

55.     Ms. Pesterfield repeatedly complained to her supervisor, Ms. Scott, and her assistant, Ms. DeVore, about her lack of office space and asked for space in the Carrillon building as there were empty desks there where she could work and retain access to necessary supplies and resources. Mr. Gonsalves was given a desk in those offices when construction noise at Colony Square became excessive.

56.     Despite Ms. Pesterfield's repeated requests, Defendant did not provide her with a workspace.

57.     Ms. Pesterfield finally secured office space in or around February 2018 when a banker at Pershing Point went on maternity leave and Ms. Pesterfield was able to utilize her desk.

**Defendant Denies Ms. Pesterfield Promotions and Advancement**

58.     In fall 2017, Ms. Pesterfield became interested in and applied for a Client Advisor position.

59.     Ms. Pesterfield had more than double the average experience in high net worth wealth management than a typical Client Advisor and had been a top awarded money manager by Atlanta Magazine for multiple years in a row.

60.   Ms. Pesterfield applied for the position through Ms. Scott and Defendant's top private wealth advisor, Mr. Key, referred her directly to Clark and Levine.

61.   Ms. Pesterfield interviewed with Clark and Levine but never heard back from them despite repeated email follow ups.

62.   Ms. Pesterfield later learned through Ms. Scott that Clark and Levine instead intended to hire from the all-male commercial banking staff.

63.   Julia Taylor, a 40 year veteran employee of Defendant, and a Client Advisor told Ms. Pesterfield that when Levine was her manager he treated her in an ageist manner, refusing to provide her assistance or resources that  he provided to younger women and telling Ms. Taylor "you're on your own."

64.   In early 2018, Ms. Pesterfield's then current banking partner, Michael Gonsalves, was vacating his Premier Banking Partner position.

65.   Ms. Pesterfield applied directly to Joey Falzone and submitted her CV and other application materials directly to him per his instructions.

66.   Mr. Falzone interviewed Ms. Pesterfield and promised her the position when Gonsalves left. Defendant, however, passed over Ms. Pesterfield in favor of a younger, less-experienced male, Stephen Guy.

67.   Mr. Guy had only been a private financial advisor for 7 years, far less than Ms. Pesterfield's 28 years.

### Defendant's Retaliatory Removal of Ms. Pesterfield from Pershing Point Branch

68.     Around February and March 2018, Ms. Pesterfield began questioning Gonsalves and their branch manager partner, Elvis Washington, why her long time clients that she was referring to them for loans and Premier banking services were showing up on internal statistics as their originating business, instead of crediting appropriately to Ms. Pesterfield for origination.

69.     After Ms. Pesterfield's inquiry, Washington and Gonsalves began shutting Ms. Pesterfield out of opportunities.

70.     Another female broker, Lynn Carter, who had preceded Ms. Pesterfield at Pershing Point, told Ms. Pesterfield that she went through an identical experience working with Washington and Gonsalves.

71.     Ms. Carter told Ms. Pesterfield that she too had complained about Washington and Gonsalves using her numbers to inflate their own position for their compensation purposes and that they successfully forced her out of the Pershing Point branch by claiming she was too difficult to work with.

72.     Ms. Pesterfield told Ms. Scott and Ms. Scott's subordinate, Sandy DeVore, about what was happening to her and how the same thing happened to Ms. Carter.

73.     Defendant, however, never asked Ms. Pesterfield for her evidence of improper attribution nor did it speak to Ms. Carter about her same experience.

74.    In April 2018, Mr. Johnson made sexist comments about Ms. Pesterfield's "emotion" in an email when she asked for financial support for a branch seminar.

75.    Ms. Pesterfield responded that Mr. Johnson was engaging in sex stereotyping by accusing her of being emotional when she was simply pointing out facts.

76.    Johnson then began retaliating against Ms. Pesterfield by asking Washington, Gonsalves, and Joey Falzone for evidence of her allegedly behaving in a problematic manner.

77.    Gonsalves later told Ms. Pesterfield and also Lynn Carter, that Johnson had gone on a vendetta against Ms. Pesterfield for several weeks as retaliation for her accusing Johnson of sexist remarks.

78.    Gonsalves told Ms. Pesterfield he had given Johnson one email from her that he did not truly have a problem with because he knew it would please Johnson.

79.    Johnson then took this alleged evidence (including emails in which Ms. Pesterfield had included language that Ms. Scott herself told her to use to defend her right to have full access to the branch) to Ms. Scott and told her Ms. Pesterfield was no longer wanted in the Pershing Point branch.

80.    Despite Ms. Pesterfield's complaints about Johnson and others, Ms. Scott told Ms. Pesterfield that she had informally gone to Human Resources who suggested Ms. Pesterfield take "personal branding classes."

81.    In April 2018, Scott removed Ms. Pesterfield from Pershing Point because "they just don't want you there" or words to that effect, even though Ms. Pesterfield was a top producer for the branch at that point.

82.    After removing Ms. Pesterfield from the Pershing Point branch, Defendant sent her to the West Peachtree branch, which provided much less opportunity for acquiring new accounts.

83.    Ms. Pesterfield learned that she had been replaced at Pershing Point by Todd Ryman, the same less-qualified, younger male that Defendant had previously passed her over for.

**Ms. Pesterfield Relocates to North Georgia and is Subjected to Defendant's Continued Retaliation and Discrimination Against Her**

84.    The discrimination and retaliation against Ms. Pesterfield unjustly damaged her reputation in the Atlanta investment community, which Ms. Pesterfield told Ms. Scott. As a result, in November 2018, Ms. Pesterfield moved from Atlanta to North Georgia.

85.    Ms. Scott assigned Ms. Pesterfield to cover Defendant's Dahlonega and Dawsonville branches.

86.    Upon her arrival at the Dahlonega and Dawsonville branches, Ms. Pesterfield learned that another employee of Defendant's, a male broker named Bill Lusby, was without Defendant's knowledge covering those branches and had been for 10 or more years.

87.    When Ms. Pesterfield advised Ms. Scott of this, she confirmed that Defendant did not know Lusby was covering those branches.

88.    Defendant's and Federal regulations and laws require that the location where a broker is doing business formally be clearly stated on the broker's Central Registration Depository ("CRD") form which is maintained by FINRA and available for review online.

89.    Ms. Pesterfield advised Scott that she had checked Lusby's CRD and there was no record on Lusby's CRD that he was formally holding himself out in those branches as the broker of record to cover them. Scott again told Ms. Pesterfield that Lusby had not told Defendant's management that he was covering them.

90.    Upon Ms. Pesterfield's arrival at the Dawsonville branch in November 2018, the manger Phillip Propst, physically removed her from the branch.

91.    Shortly thereafter Ms. Scott informed Mr. Propst's superior that Ms. Pesterfield would be the broker assigned there and it was not his decision to make.

Mr. Propst allowed Ms. Pesterfield to work in the branch for approximately 6 to 8 weeks but he still sent accounts to Lusby instead.

92.     In early January 2019, he again threw Ms. Pesterfield out, but this time with Ms. Scott's support.

93.     In or around June 2019, Lusby retired.

94.     Despite Ms. Pesterfield exposing Lusby's improper coverage of the branch, Defendant had inexplicably allowed him to retain accounts.

95.     Under Defendant's redistribution policy, Lusby's accounts should have gone to Ms. Pesterfield following his retirement.

96.     Instead, Scott reassigned them to two male brokers working out of Atlanta, over 100 miles away.

97.     Defendant's policy is that the most important factor in account distribution is proximity to clients.  When Ms. Pesterfield reminded Scott of this policy, Scott added a third male broker to the accounts at issue, this man based out of Cumming, Georgia, approximately 30 miles away.

98.     That male broker only had 3 years of experience  as compared to Ms. Pesterfield's 28.

99.     Defendant assigned other accounts from the Dawsonville and Dahlonega branches to an "800" phone number call in desk in Atlanta, a bullpen of

random brokers to help lower account level clients and which exceeded those brokers' "wealth band" of accounts they were allowed to service.

100.   Ms. Pesterfield checked the account records on the computer system at the request of Jennifer Justus, the Dahlonega branch manager, who was confused as to why clients she sourced for Lusby were now being sent to brokers in Atlanta who had not visited the branch or met any of these clients.

101.   Ms. Pesterfield saw that no one else was listed on those Dahlonega branch account names in the computer system.

102.   Ms. Pesterfield told Ms. Scott that no one else was listed on the account names.

103.   Ms. Justus stated that none of the clients knew any broker assigned to them besides Lusby.

104.   Ms. Justus requested that Lusby's accounts be transferred to Ms. Pesterfield, but Ms. Scott refused.

105.   In contrast, when Mr. Propst had requested accounts go to Lusby or referred them to him, Ms. Scott complied.

106.   The accounts should have been assigned to Ms. Pesterfield, but even accounts within Ms. Pesterfield's wealth band were sent to a number in Atlanta for essentially random assignment to other brokers.

107.   It was obvious to Ms. Pesterfield that Defendant was following an "anyone but Pesterfield" model of account re-distribution.

### Ms. Pesterfield's Further Protected Activity and Defendant's Retaliation

108.   In June 2019, faced with ongoing discrimination and retaliation, Ms. Pesterfield contacted Defendant's Human Resources department and followed up with a written complaint of age and sex discrimination and retaliation in August 2019.

109.   When Ms. Pesterfield informed Ms. Scott of her contacting Human Resources and her complaint, Ms. Scott intensified her retaliatory activity.

110.   Ms. Scott scheduled their Annual Midyear review call on the last day possible to do it, scheduling it on the same day that her written review and Ms. Pesterfield's written response were due.

111.   Scott sent the meeting request only two days before and Ms. Pesterfield responded immediately that she had a previously scheduled meeting with an important prospective client at that time.

112.   Ms. Pesterfield asked if they could instead conduct the mid-year review on August 22 during an already-scheduled monthly "One on One" management phone call. Scott responded that she would look to reschedule.

113.   Then, the morning of the August 15, while Ms. Pesterfield was out of the office in meetings, Scott emailed requesting a 2:15 call (which conflicted with

Ms. Pesterfield's calendar), even though she knew Ms. Pesterfield was in meetings and would not see the email.

114.   Scott then called but did not leave a message. Scott then wrote Ms. Pesterfield up on her mid-year review for not answering the phone, making it falsely appear that Ms. Pesterfield refused to have her mid-year review.

115.   Because Ms. Scott set everything on the same day that her written review and Ms. Pesterfield's written response were due, Ms. Pesterfield was unable to rebut her claim.

116.   On August 22, Ms. Scott claimed that she was getting complaints about Ms. Pesterfield's alleged rude behavior but refused to identify who made the alleged complaints or provide any details about them.

117.   Ms. Pesterfield reminded Scott that the last time there were alleged complaints about her it was Johnson retaliating against her in a sexist fashion, and Ms. Scott had not done anything to stop it. Instead, she abetted it by removing Ms. Pesterfield.

118.   During this same call Scott once again instructed Ms. Pesterfield to take "personal branding" classes.

119.   In June 2019 Denise Dixon, a Compliance Officer for Defendant, offered to help Ms. Pesterfield get her Florida Insurance licensing cards.

120.   After Ms. Pesterfield filed her complaint against Scott, Dixon revoked her offer to help.

121.   Ms. Pesterfield asked Scott and Ms. DeVore to order cards for her and overnight them since the Dahlonega Branch does not have service from USPS but Scott repeatedly refused.

122.   Instead, she told Ms. Pesterfield to drive more than 100 miles round trip away from her office for fingerprinting.

123.   Scott knew Ms. Pesterfield had a significant commission pending that licensing and her refusal to support Ms. Pesterfield with an ordinary licensing request was both part of her constructive discharge efforts, and an attempt to block Ms. Pesterfield from hitting production targets.

124.   Ms. Pesterfield lost her most lucrative branch and numerous opportunities as a result of Defendant's discrimination and retaliation.

125.   As a result of Defendant's discriminatory and retaliatory actions, Ms. Pesterfield was placed in a position where it became financially unfeasible and would have been ruinous for her to continue.

126.    On or about November 21, 2019 Ms. Pesterfield was forced to resign her employment with Defendant.

127.   Defendant constructively terminated Ms. Pesterfield.

## COUNT I
## SEX DISCRIMINATION IN VIOLATION OF TITLE VII

128.   Plaintiff hereby incorporates by reference the preceding paragraphs of the Complaint as if fully restated herein.

129.   Plaintiff is in a protected class based on her sex (female).

130.   Plaintiff was an "employee" as defined by Title VII, 42 U.S.C. § 2000e et seq.

131.   Plaintiff was qualified for the position to which she was hired.

132.   Defendant is an "employer" as defined by Title VII, 42 U.S.C. § 2000e et seq.

133.   Defendant discriminated against Plaintiff in the terms and conditions of her employment when, among other things, it treated her differently and less favorably because she was a female as compared to her male peers including, but not limited to, re-assigning accounts to which Plaintiff should have been assigned to male brokers, preventing Plaintiff from pursuing business opportunities in favor of similarly situated males, removing Plaintiff from more lucrative branches in favor of male employees, denying Plaintiff workspace and work materials, denying Plaintiff compensation for other work on Defendant's behalf, and constructively terminating Plaintiff.

134.   Defendant undertook this unlawful conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, entitling her to recover punitive damages against Defendant.

135.   Additionally, or in the alternative, Defendant undertook its unlawful conduct recklessly with respect to Plaintiff and her federally protected rights, entitling her to recover punitive damages.

136.   As a direct and proximate result of the Defendant's actions, Plaintiff suffered damages including stress, emotional distress, inconvenience, loss of income and benefits, humiliation, damage to professional reputation, and other indignities.

137.   Plaintiff is entitled to an award of back pay and benefits, compensatory damages, attorney's fees, punitive damages, and all other appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of Title VII.

## COUNT II
## Retaliation in Violation of Title VII

138.   Paragraphs 1 through 127 are incorporated herein by reference.

139.   Plaintiff engaged in statutorily protected activity by objecting to, reporting, and complaining of sex discrimination prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. including but not limited to opposing discriminatory actions and remarks, making internal

complaints of discrimination to her manager, and making a complaint of discrimination to Defendant's Human Resources department.

140.   Defendant subjected Plaintiff to retaliation for her protected conduct, including, but not limited to, demeaning and exclusionary treatment, disparate treatment in account and branch assignments, unjustified interference with her livelihood, unjustified criticism, and her constructive termination in violation of Title VII.

141.   Defendant undertook this unlawful conduct intentionally and maliciously with respect to Plaintiff and her federally protected rights, entitling her to recover punitive damages against Defendant.

142.   Additionally, or in the alternative, Defendant undertook its unlawful conduct recklessly with respect to Plaintiff and her federally protected rights, entitling her to recover punitive damages.

143.   As a direct and proximate result of the Defendant's actions, Plaintiff suffered damages including stress, inconvenience, loss of income and benefits, humiliation, emotional distress, damage to professional reputation, and other indignities.

144.   Plaintiff is entitled to an award of back pay and benefits, compensatory damages, attorney's fees, punitive damages, and all other

appropriate damages, remedies, and other relief available under Title VII and all federal statutes providing remedies for violations of Title VII.

## COUNT III
## Age Discrimination in Violation of the ADEA

145.   Plaintiff incorporates by reference paragraphs 1 through 127 as if fully restated herein.

146.   Plaintiff is a member of the protected age group in that she is over the age of 40 years old.

147.   Plaintiff was, at all relevant times during her employment with Defendant, an employee protected by the ADEA.

148.   At all relevant times, Plaintiff was qualified for the position she held, based on her performance and years of experience in the industry.

149.   Defendant discriminated against Plaintiff in the terms and conditions of her employment when, among other things, it treated her differently and less favorably to her substantially younger peers including, but not limited to, re-assigning accounts to which Plaintiff should have been assigned to substantially younger brokers, preventing Plaintiff from pursuing business opportunities in favor of similarly situated and substantially younger employees, removing Plaintiff from more lucrative branches in favor of substantially younger employees, denying

Plaintiff workspace and work materials, denying Plaintiff compensation for other work on Defendant's behalf, and constructively terminating Plaintiff.

150.   In taking these adverse actions against Plaintiff, Defendant unlawfully discriminated against her on the basis of her age in violation of the ADEA.

151.   Plaintiff is entitled to an award of back pay and benefits, front pay, liquidated damages, injunctive relief, attorneys' fees, and all other appropriate damages, remedies, and other relief available under the ADEA and all federal statutes providing remedies for violations of the ADEA.

## COUNT IV
## Retaliation in Violation of the ADEA

152.   Plaintiff incorporates by reference paragraphs 1 through 127 as if fully restated herein.

153.   Plaintiff engaged in protected activity under the ADEA when she complained of age discrimination to Defendant's Human Resources department.

154.   Defendant unlawfully retaliated against Plaintiff, including, but not limited to, constructively terminating her employment after she complained about age discrimination.

155.   Defendant's actions, in subjecting Plaintiff to retaliation for engaging in protected activity by complaining of, and opposing, age discrimination and retaliation in the workplace, constitute unlawful intentional retaliation in violation of the ADEA.

156.   As a result of Defendant's unlawful actions, Plaintiff has suffered loss of income and benefits compensable under the ADEA, for which Defendant is liable.

157.   Defendant violated the ADEA willfully and wantonly, and intentionally.

158.   Plaintiff is entitled to an award of back pay and benefits, front pay, liquidated damages, injunctive relief, attorneys' fees, and all other appropriate damages, remedies, and other relief available under the ADEA and all federal statutes providing remedies for violations of the ADEA.

## **<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff demands a **TRIAL BY JURY** and that the following relief be granted:

A.   That this Court take jurisdiction of this matter;

B.   That process be served;

C.   That Plaintiff be awarded a declaratory judgment that Defendant violated Title VII and the ADEA, as described above;

D.   That this Court enter a permanent injunction, prohibiting Defendant from engaging in unlawful employment practices, including unlawful sex discrimination, age discrimination, and retaliation;

E.   That this Court award Plaintiff full lost wages and lost benefits;

F.     That this Court order that Plaintiff be reinstated to Plaintiff's former position with Defendant, or in the alternative, award front pay to compensate Plaintiff for lost future wages and benefits;

G.     That this Court award Plaintiff prejudgment interest and post-judgment interest;

H.     That this Court award compensatory damages in an amount to be determined by the trier of fact;

I.     That this Court award punitive damages for Defendant's willful violations of the law;

J.     That this Court award liquidated damages for Defendant's willful violations of the law;

K.     That this Court award Plaintiff her costs in this action and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988, and other applicable laws;

L.     That this Court grant Plaintiff the right to have a trial by jury on all issues triable to a jury; and

M.     That this Court grant such additional relief as this Court deems proper and just.

Respectfully submitted this 30th day of May, 2024.

By:    /s/ Thomas J. Mew
       Edward D. Buckley
       Georgia Bar No. 092750
       edbuckley@bbwmlaw.com
       Thomas J. Mew IV
       Georgia Bar No. 503447
       tmew@bbwmlaw.com
       Buckley Bala Wilson Mew LLP
       600 Peachtree Street, NE
       Suite 3900
       Atlanta, GA  30308
       Telephone: (404) 781-1100
       Facsimile: (404) 781-1101
       *Counsel for Plaintiff*